4-6077                                    144 S. W. 2d 1067

Opinion delivered November 25, 1940.

*Duty & Duty* and *Bernal Seamster,* for appellant.

*Clyde T. Ellis,* for appellee.

GRIFFIN SMITH, C. J.   B. B. Kilgo, as administrator of the estate of W. N. Foust, has appealed from a decree of the Benton chancery court surcharging and falsifying his accounts. The plaintiffs, as heirs and creditors, have cross-appealed.

December 10, 1930, Foust and Kilgo, by written contract, agreed to an exchange of property.[1]   Before con-

[1] Foust owned lands in Washington and Benton counties. Kilgo owned a stock of general merchandise at Best, in Benton county.

ditions had been met Foust died,[2] and shortly thereafter Kilgo was appointed administrator of his estate. Three reports were made: June 7, 1932, February 20, 1933, and November 20, 1933. It is stated in the complaint that each report was approved by the probate court. The charge is, however, that certain items were fraudulently allowed, and that the administrator fraudulently caused the settlements to be confirmed.

The first settlement, styled a "final report," recites that assets of the estate consisted of a stock of goods which invoiced $4,697.82 at the time the administrator took charge,[3] and certain book accounts and notes. It is then recited that "claims amounting to $3,065.10 had been presented and disposed of."

Kilgo continued to operate the store after Foust's death. Following his appointment as administrator (and before) Kilgo purchased new stocks and employed help. Kilgo acted on the assumption that all of the merchandise belonged to the estate, and that the estate owed him $1,697.82. To arrive at this figure Kilgo made certain charges against Foust[4] whereby the value of goods and fixtures to be transferred was reduced to $3,000. In respect of credits claimed by Kilgo, the chancellor made the finding shown in the footnote.[5]

Foust executed and delivered to Farmers State Bank at Rogers his deed to certain lands, the deed to be redelivered to Kilgo "upon delivery of the stock of merchandise." The contract recites that "as exchange for said lands Kilgo conveys and sets over a certain stock of merchandise . . . at a consideration of $3,500, less $235.75 mortgage on Benton county lands, it being understood and agreed that said stock of merchandise at this time is far in excess of $3,500, and Kilgo is given a period of 90 days in which to sell and reduce said stock of merchandise to $3,500."

[2] Foust's death occurred April 11, 1931.

[3] Kilgo's appointment as administrator is dated April 20, 1931.

[4] The items Kilgo claimed he was entitled to recover or retain from the estate were: Amount equal to mortgage, $235; back taxes on Washington county lands, $41.41; back taxes on Benton county lands, $41.43; cash advanced to Foust for taxes, $24.82; security on notes, $115; cash advanced, $20.35; merchandise, $2.85; applied on store accounts, $19.15—total, $500.

[5] "The court has been unable to discover in the record where any claims were made, sworn to, and filed or allowed by the court for these amounts, except that these items were included as credits in favor of the administrator and charged against the estate in settlements filed in and approved by the probate court. There is shown in the files a claim for $42.60 purporting to be an itemized account of Kilgo against Foust. This account was neither signed nor verified by Kilgo, but it bears an indorsement that it was allowed by the administrator and also by the court."

In explanation of items aggregating $3,065.10 claimed to have been "presented and disposed of," the administrator says the accounts were contracted "in the operation of the mercantile business of said estate, under directions of [the probate] court, and should probably be allowed and paid in full."

Another statement in the report is that at the time the administrator took charge there were outstanding claims of $675.11. It was then explained that the items represented indebtedness existing at the time Foust died.[6]

An order of the probate court is referred to which authorized the administrator to sell the entire stock of merchandise. It is then stated that such sale was made October 1, 1931, to J. L. Patton, for $1,200. The following is quoted from Kilgo's final report: "At the time said administrator was appointed there was due on the purchase price of the stock of merchandise to the said B. B. Kilgo the sum of $1,697.82 from the said W. N. Foust, which was a lien and which has been paid."

October 2, 1931, the administrator swore to a report of the Patton purchase. It is not otherwise dated, but concurrently the court found that the property brought a fair price; that the sale consisted of the interest of W. N. Foust "in the stock of merchandise heretofore operated by the administrator; that possession should vest in Patton," and that "in view of the fact that the said B. B. Kilgo had a lien on said merchandise, furniture, and fixtures for the purchase price thereof to the extent of $1,697.82, he is directed to pay himself said sum of money out of said purchase price and the amount of money that he has received from the liquidation of said stock of merchandise heretofore.'"[7]

---

[6] Eleven firms or individuals are listed, the amounts ranging from $4.20 to $236.22, but dates of invoices are not shown.

[7] Effect of the first annual report is to show that the administrator, treating the $3,000 interest he had in the merchandise and fixtures as having passed to Foust, a total charge against the administrator of $4,697.82 was made. Accounts for new merchandise charged to the Foust estate "which probably should be allowed and paid in full" were listed as $3,065.10, and items of $675.11 claimed to have been due by Foust at the time of his death were "properly filed and duly probated." The two groups of claims amounted to $3,740.21. Twelve hundred dollars was received from Patton, and Kilgo, individ-

The second report brought forward a balance of $1,-515.20, to which was added $65.10 realized from book accounts and notes, less payment of $140 to A. D. Callison. The amount with which the administrator then stood charged was $1,440.30.

The final report, (undated, but referred to in the complaint as having been made November 20, 1933) recites that in so far as possible, the estate had been fully closed.

After mentioning former transactions, the report lists eighteen claims amounting to $1,104.12 as having been outstanding when the administrator took charge. This is followed by the assertion that they were outstanding at the death of Foust. It is then stated that "under previous orders of the court" the mercantile business was continued until October 1, 1931. In operating the business fifteen obligations amounting to $1,-399.93 were incurred, together with expenses of $1,085.10. The Callison item of $140, it was explained, was for "funeral expenses paid by direction of the court."

Additional assets not formerly identified, but referred to as bills receivable, amounted to $705.85, and: "Of the above accounts, your administrator has been able to collect the sum of $45, leaving a balance on notes and open accounts of $669.82, which are deemed worthless and uncollectible."

In recapitulating there is this statement: "Total invoice of merchandise, $4,697.82. *Goods bought by Foust and Kilgo during administration and not paid for, $1,776.04.*[8] Accounts other than store collected, $45. Total, $6,518.87." Credit was taken for the nineteen items listed in the footnote,[9] amounting to $6,550.04.

ually, claimed $1,697.82 was due him. In the administrator's hands, subject to distribution, was $1,515.20 in cash, and book accounts and notes aggregating $310.20.

[8] Italics are supplied.

[9] Paid B. B. Kilgo, amount realized from reducing stock to $3,000, $1,697.82; for hired help, $150; rent and lights, $60; taxes on store, $38.35; auctioneer, $15; sales bills, $24; cigarette license, $5; ice, $14.25; filing invoices, $2.30; insurance on stock, $23.40; cash in bank, $32.65; attorneys' fees, $25; loss on sale of store, $2,404.60; account made by W. N. Foust for merchandise bought, $43.80; B. B. Kilgo, salary, $400; B. B. Kilgo, commission, $284; A. D. Callison, funeral expense, $140; cash on hand at this time, $957.60; discount on sales made in September, 1931, $232.27. Total, $6,550.04.

Money deposited in bank from April 17, 1931, to October 24 of the same year was $7,978.71. This showing was followed in the report by an entry of $1,200 for sale of merchandise—a total of $9,178.71.

Since the smallest item deposited was $1.50, and the largest was $587.86, and the only deposit made after October 1 was $1.50, it seems conclusive that proceeds of the final sale were not deposited. The only bank balance referred to is $32.65, leaving $9,146.06. Whether the cash balance of $957.60 was residue of the $1,200 item is unexplained.

In any event the administrator received, according to his report, $9,178.71. He lists payments by check of $7,978.70, and uncleared checks of $88.01—$8,066.71, $41.91 of which had been "returned and taken up." The bank balance of $32.65 would be insufficient by $13.45 to pay the remaining outstanding checks of $46.10. The difference between $9,146.06 and $8,066.71 is $1,079.35. The report concludes with this statement: "Your administrator further states that there is now in his hands the sum of $957.60 to be distributed under the orders of this court, less such other fees and expenses as the court may allow."[10]

Thomas G. Foust, as son and heir of W. N. Foust, filed exceptions to the first settlement. He asked the court to require the administrator to file a complete report of merchandise sold at private sale; that it be shown from whom merchandise was purchased, and in what amounts, covering the period the store was operated after the intestate's death; that book accounts be exhibited showing accounts due the business as of April 20, 1931; that the administrator be required to show what merchandise was sold on credit during operation of the business subsequent to the time Kilgo contended W. N. Foust became interested; that the administrator be required to repay $1,697.82 to the estate, and that he be

---

[10] From the figures set out in the three reports it is impossible to draw a balance, or to show what fund is or should be in the hand of the administrator. The items mentioned in the opinion are for comparative purposes, and may not take into account all elements intended to be considered, but which cannot be commented upon because of obvious inaccuracies.

charged in full for merchandise that came into his hands "at the time he took possession thereof as administrator, and that he be required to account therefor, and that said administrator be charged in full as such for all expenditures made by him in the purchase of merchandise after the death of the intestate and up to the time of the sale of the stock October 1, 1931."

Exceptions were also filed by Thomas G. Foust to the administrator's second report. It was insisted he was not entitled to credit for merchandise purchased for the purpose of continuing "operation of the mercantile business of the deceased." There is this objection: "Said administrator is chargeable with all uncollected accounts made by him after he took charge of the estate and merchandise. B. B. Kilgo, in the lifetime of the said W. N. Foust, for a valuable consideration, agreed to reduce said stock of merchandise to $3,500, and in the reduction thereof said administrator cannot charge the estate for any loss occasioned thereby."

On behalf of himself and "other heirs or creditors desiring [to object], and without waiving former exceptions," Thomas G. Foust excepted to the third report. It was alleged that an account of $6.50 allowed in favor of Mansfield Lumber Company was a debt not incurred by the intestate; that $98.55 approved in favor of Wood-Beasley Seed Company was allowed by the probate court for only $28.55; that $78.68 approved in favor of McGregor Hardware Company was allowed by the court for $8.69, and that an alleged payment of $17.50 to Apple Hat Company had not been authorized by the court.

In respect of the items aggregating $1,399.93 heretofore mentioned as claims "contracted by the administrator and duly allowed and probated," the exceptor listed fourteen of the items, amounting to $1,390.95.[11] It was contended that "none of the alleged indebtedness for which payment is alleged to have been made was created by deceased in his lifetime, nor existed contingently at the time of his death." There was the further objection

---

[11] An item of $8.98 (presumably the McGregor Hardware Company allowance) is not mentioned in the exception.

that as to $32 in favor of Queen City Broom Company, and $53.30 to Berry Dry Goods Company, no claim was presented to the probate court.

Exceptions were filed to twelve of fourteen items of expense, aggregating $1,085.10.[12]

There are exceptions to Kilgo's claim of $500, which in his testimony Kilgo justifies by the assertion that subsequent to execution of the written contract there was a supplemental agreement whereby he (Kilgo) assumed the mortgage on the Foust farm. He also charged to Foust's account two notes payable to Kilgo on which Foust was surety, and alleged other payments or assumptions or credits by consent. On these items it is said that "they do not represent any debt or obligation of the deceased, [nor do they arise] in consequence of any claim probated against said estate."

There are exceptions to the administrator's claim for credit of $1,776.04 for goods bought by Foust and Kilgo during administration.

Finally, there are specific exceptions to the following items: Amount paid to Kilgo, $1,697.82; cash in Farmers State Bank, $32.65; loss on sale of store, $2,404.60; account made by W. N. Foust, $43.80; discount on sales of September, 1931, $232.27.

October 8, 1935, the court ordered payment of $572.68 as first class claims, $60 as second class claims, $95.20 as third class claims, $1,555.16 as fourth class claims, and $91.37 as fifth class claims.

There is an order (undated) approving the administrator's final report. The complaint, filed October 15, 1935, recites filing of this settlement November 20, 1933, and that it was "subsequently" approved.

The complaint in equity is by Eunice Garvin, Mamie Wilson, W. M. Foust, Norman Foust, Lora Bowlin, Clyde Foust, Thomas Gilbert Foust, and E. L. Blake.

---

[12] In the administrator's report two items of $12 each in favor of J. P. Shofner (for sales bills) are listed, while in the exceptions these have been combined as $24. The report listed $25 as attorney fees, to which no exception was taken. Also, in the report Kilgo asked credit of $400, covering salary at $75 per month. In the exceptions this item appears as $460. Totals excepted to are $1,120.10, instead of $1,085.10.

An order of the probate court is shown in the footnote.[13] Another order granted the administrator permission to sell goods at a reduction of 25 per cent. In the petition, Kilgo stated that "as a part of the assets [of the administration] there is a stock of general merchandise in which the deceased has an interest, . . . which is now being operated by said administrator." As justification for reducing prices, Kilgo stated: "Said store has been operated and the stock depleted to a considerable extent; [therefore] it is impossible for your administrator to proceed to close out said merchandise, or sell same at the regular prices usually received for merchandise *owned by a going concern in which the stock has been kept replenished* . . ."[14] The court found that the petition was signed by Kilgo and "certain heirs at law of W. N. Foust."

An inventory filed by the administrator, subscribed to May 28, 1931, lists real property valued at $500, and certain personal property estimated to be worth $714.62.[15] There is this further statement: "Stock of merchandise bought from B. B. Kilgo about April 7, 1931, $4,697.82."

In the letters issued to Kilgo, there is a recital that "all the heirs at law and all those entitled to a share of distribution in the estate who are residents of the state of Arkansas have signed a written petition to this court asking that B. B. Kilgo be appointed as administrator."

[13] That [Clyde Foust, Mrs. Russell Bowlin, Norman Foust, and Eunice Garvin] were heirs-at-law of W. N. Foust, and that with B. B. Kilgo they represented that the administrator was attempting to sell the stock of goods known as the Kilgo stock at Best; that the highest bid was $1,000; that invoices of stocks and fixtures showed values of about $3,900; and that the bid was insufficient. "We therefore respectfully request the court to direct the administrator to continue the reduction sale of goods in said store until and including the 30th day of September, 1931, and to have him cause an auction sale of the remainder of the goods in the store and the fixtures to be sold in a lump sum on the first day of October."

[14] Italics supplied.

[15] Real Estate, $500; Note of E. M. Austom and interest, $144.50; Note of Claud Means and interest, $31.90; Note of Gilbert Foust $36.85, Interest $25.20, $62.05; Open account against B. B. Kilgo Labor, $25; L. W. Dean balance on horse, $8; Burs Wolf pasture, $8; Marvin Clardy balance on hay, $9.50; One note Garland Wilson $60, interest $7.50, $67.50; One note Garland Wilson $45, interest $4.85, $49.85; Account of Maston Foust, $235.75; Small bills in store from 5c to $2, $52.57; D. Youngman, $20; Stock of merchandise bought from B. B. Kilgo about April 7, 1931, $4,697.82—Total $5,912.40.

Kilgo testified, after having referred to an account book, that excluding his own claim of $1,697.82, demands against Foust's estate as of the date of his death were $2,257.67.

### Other Facts—And Opinion

Chancery jurisdiction was sought on the ground that fraud had been practiced on the probate court, and that it had not been discovered in time to procure relief through appeal. The defense is three-fold: (1) there was no fraud; (2) appellees and cross-appellants did not appeal from certain judgments of the probate court overruling exceptions, and (3) there was an appeal by Eunice Garvin as to allowance of Kilgo's claim of $1,697.82, and that appeal is pending in circuit court.

The record is far from satisfactory. In some respects it is impossible to ascertain what *was* done. Each party to the appeal has gone outside the record for alleged facts with which to support arguments.

As to Kilgo's assertion that Eunice Garvin's appeal is in circuit court, the only evidence of this seems to be a probate court docket entry of April 18, 1932, that "the appeal of Eunice Garvin [is] granted upon her taking proper proceedings."

Since the administrator's final settlement was not filed until November 20, 1933—more than a year and seven months after the docket entry—the appeal must relate to matters antedating the final report, for in the final report the $1,697.82 claim was reasserted, and allowed. Appellees go out of the record to assert (brief page 51) that after Eunice Garvin had attempted to effectuate her appeal, and after it was too late to obtain another, it was discovered that all of her appeal papers "and any circuit court docket entries that may have been made, mysteriously disappeared."

It is clear that the probate court did not consider that the subject-matter was embraced within an appeal, for it continued to deal with the items and to adjudicate rights of the parties.

It was directed, by certiorari, that certain records be brought to this court in aid of the chancery appeal.

The Benton circuit clerk responded, as shown in the footnote.[16]

Appellant argues the evidence sustains his assertion an appeal was taken, and that appellees and cross-appellants cannot invoke the jurisdiction of chancery. Conversely, if the appeal was not perfected before jurisdiction of chancery was invoked, appellees could not appeal to circuit court.

In the light of facts herein recited, and matters shown by the record to which reference is not essential, we conclude that no appeal was pending in circuit court. An appeal must be granted by the probate court upon prayer of the dissatisfied party, accompanied by affidavit. Pope's Digest, § 2885; *Matthews* v. *Lane,* 65 Ark. 419, 46 S. W. 946; *Speed* v. *Fry,* 95 Ark. 148, 128 S. W. 854; annotations to Pope's Digest, p. 994.

No affidavit having been filed by Eunice Garvin, and the circuit clerk's return on the writ of certiorari constituting an affirmative showing that there is nothing of record in that court relating to the appeal, it must be assumed that the probate court's order was that the appeal *would be* granted "upon her taking proper proceedings."

The next question is, Did the chancery court acquire jurisdiction? No principle is better established than that a court of equity cannot lift an estate out of the probate court and administer it, or even interfere to correct errors and irregularities where actual fraud is not alleged and proved. But there is an exception to this rule. If the facts alleged in the complaint are such as to necessarily draw to the transactions an inference that equity alone can give relief, then such jurisdiction may be invoked.

As was said in *Hankins* v. *Layne, Exr., et al.,* 48 Ark. 544, 3 S. W. 821, a court of equity "cannot even interfere

[16] "On April 5, 1940, there was an order filed for record, . . . stating that on April 1, 1932, an appeal from the probate court was filed in this office . . . in the matter of the estate of W. N. Foust, deceased, B. B. Kilgo, administrator. I further certify that I have searched the records and find that there has never been filed in this office an appeal from the probate court as above mentioned."

to correct errors and irregularities where actual fraud is not alleged and shown, unless they are so gross and reckless as to make the inference of fraud necessary to the purposes of justice; nor can it take upon itself to correct frauds in unconfirmed settlements. But it can interpose to correct frauds in confirmed settlements, and other frauds and gross mistakes in the course of administration not within, or having passed from, the jurisdiction of the probate court, and also to prevent impending irreparable injury where the probate court cannot give effectual relief.''

Were elements in the instant case such as to bring transactions within the exceptions mentioned in the Hankins case?

It is alleged that fraud was practiced upon the court. The final settlement had been approved, and apparently administration has passed from the probate court. Lands owned by W. N. Foust, and described in his deed to Kilgo, were by agreement of the parties worth $3,500, less $235.75, or a net evaluation of $3,264.25. The contract does not show taxes were delinquent, although Kilgo claims that they were. Foust owned other lands appraised at $500, and personal property listed by the administrator at $714.62. All told, his estate appears to have been worth $4,478.87, if we assume the contract to exchange lands for merchandise and store fixtures was not executory. There is no allegation that the agreement was not sufficiently acted upon to pass title to merchandise and fixtures. By his conduct in assisting with inventory early in April, with the apparent intent of taking over the business, Foust waived any requirement that the reductions be consummated within ninety days from December 10. When he died all parties assumed that the estate's interest in the goods and fixtures was $3,500, and that the difference belonged to Kilgo. The value of this difference, according to Kilgo, was $1,697.82.

Although there was acquiescence by some of the heirs and creditors in Kilgo's action in continuing the business, certainly no one supposed he would involve the estate to the extent of thousands of dollars by purchas-

ing new merchandise and then procuring a court order permitting sales at 75 per cent. of cost.

Other than Kilgo's testimony, there is no evidence of the so-called oral agreement with Foust subsequent to December 10 permitting charges of $500, thus reducing the Foust interest to $3,000. The testimony of Kilgo, an interested party, will not be regarded as undisputed. *McDonald* v. *Olla State Bank,* 192 Ark. 603, 93 S. W. 2d 325; West's Arkansas Digest, "Evidence," p. 588.

After Foust died, every advantage was with Kilgo. He, and he alone, knew whether the store assets invoiced $4,697.82; and whether other goods said by Kilgo to have been purchased for the account of Foust and segregated in a back room in anticipation of later use were actually bought by Foust or at his direction.

Following Foust's death, the business was conducted as a partnership. In his final settlement the administrator listed "goods bought by *Foust and Kilgo* during administration and not paid for, $1,776.04." Other goods were similarly bought, but were paid for. Throughout the entire record there is irrefutable evidence of Kilgo's purpose to use Foust's property as a means for securing, dollar for dollar, the value of his own claimed interest in the merchandise and fixtures. By his own acts items were confused. Property was inextricably mingled; and goods claimed by Kilgo were sold and a lien asserted on the proceeds. He charged commissions for acting as administrator and employed himself at a salary of $75 per month to conduct a business for his own benefit. He did not take legal steps to enforce collection of certain assets of the estate, but pleaded his own knowledge of their worthlessness. They may have been worthless, but certainly, in every way, he was operating the mercantile business for the fraudulent purpose of salvaging his own interests and compelling his trust to bear the burden.

Net result is that the administrator got full returns on his asserted interest of $1,697.82; a salary of $460; commissions of $284, and other values. He completes all of these transactions by retaining farms valued at $3,500. With the exception of a few inconsiderable pay-

ments the estate owes hundreds of dollars, and there is little with which to pay.

Of controlling force in arriving at our finding that fraud was practiced on the probate court is Kilgo's statement in his inventory of May 28 that Foust, about April 7, 1931, "bought from [me] a stock of merchandise of the value of $4,697.82." By this statement the administrator not only withheld from the court information that he personally owned part of the merchandise, but in effect he affirmatively alleged that the $1,697.82 apportionment belonged to Foust.

The law does not permit such a course of conduct without affording a remedy. It is our view that equity alone can give relief. Under the rule stated in *Hankins* v. *Layne, supra,* the suit was properly brought. The estate was not indebted to Kilgo on account of $1,697.82 in merchandise and fixtures.

Appellees and cross-appellants have outlined the kind of settlement they think Kilgo should now be required to make. (See footnote [17].) Some of the items mentioned in the suggestion have not been referred to in this opinion because of uncertainty as to the evidence in relation to them.

The special chancellor proceeded on the theory that relief could not be given in respect of exceptions that were overruled, and as to which appeals were not taken. In view of our holding that most of the transactions are

[17] "Require Kilgo to bear all the costs of reducing the stock to the contract amount. This would be $1,069.27. Require him to accept for his own goods the amount in proportion for which the entire stock sold. This was, as we shall show later, 50 cents on the dollar. Thus he would receive 50 per cent. of $1,433.57, or $716.78, and would be required to return to the estate $981.04—the difference between the $1,697.82 that he took and what he should have taken. Thus also his commissions would be reduced from $284 to $99.29 (5 per cent. of $1,985.89—the highest amount which he could be allowed on the balance of the estate which he received and paid out, and which amount was $1,985.89). $284 less $99.29 leaves $184.71, which he must return on this item. Thus he would also be required to return to the estate the $235.75 with which he charged the estate in the settlement of his own obligation to P. W. Boone, plus the $100 which he made on the deal, or a total of $335.75. Thus he would be required to return to the estate, over and above the amount which he showed in his final settlement to have in his possession for the creditors, a grand total of $2,597.77 to be paid out to the creditors and heirs who were plaintiffs to this action."

permeated with fraud, and that fraud was practiced upon the court, appellees have not lost their rights. We think it best, therefore, to reverse on cross-appeal and remand the cause with directions to have the accounts restated and to render a decree not inconsistent with this opinion. Affirmed on direct appeal.

Mr. Justice FRANK G. SMITH concurs.